

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-21-2001

# Myrie v. Comm NJ Dept Corr

Precedential or Non-Precedential:

Docket 99-6059

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Myrie v. Comm NJ Dept Corr" (2001). *2001 Decisions.* Paper 218.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/218

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 21, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 99-6059 & 99-6060

JUNIOR SAMUEL MYRIE,
        Appellant

v.

COMMISSIONER, N.J. DEPARTMENT OF CORRECTIONS;
DONALD E. LEWIS, WARDEN;
CORU, BUREAU OF AUDIT & ACCOUNTS;
JOHN DOES, NUMBERS 1 THROUGH 10,
(Fictitious Names) Members of the
Administration Riverfront State Prison;
RICHARD ROES, NUMBERS 1 THROUGH 10,
(Fictitious Names) Members of the Commissioner
of Department of Corrections Office

On Appeal from the United States District Court
for the District of New Jersey
District Judge: Honorable Anne E. Thompson
D.C. No. 98-cv-03708

NORWOOD L. WHITE,
        Appellant

v.

JACK TERHUNE; STEVEN PINCHAK

On Appeal from the United States District Court
for the District of New Jersey
District Judge: Honorable Anne E. Thompson
D.C. No. 98-cv-04356

Argued: January 8, 2001

Before: SCIRICA and AMBRO, Circuit Judges
and POLLAK,* District Judge

(Filed: September 21, 2001)

Richard S. Lehrich, Esq.
Laura M. Le Winn, Esq. (Argued)
190 North Avenue East
P.O. Box 8
Cranford, New Jersey 07016

Counsel for Appellants

John J. Farmer, Jr., Esq.
Attorney General of New Jersey
Mary C. Jacobson, Esq.
Assistant Attorney General
Jeffrey K. Gladden, Esq. (Argued)
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, N.J. 08625

Counsel for Appellees

OPINION OF THE COURT

POLLAK, District Judge:

On this consolidated appeal of two cases jointly adjudicated in the District Court for the District of New Jersey, Junior Samuel Myrie and Norwood L. White, both of whom are inmates of New Jersey prisons, contend that the District Court erred in sustaining the validity-- challenged under several provisions of the Constitution of the United

_____

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation

2

States and cognate provisions of the Constitution of New Jersey -- of N.J. Stat. Ann. S 30:4-15.1. The statute provides:

CHAPTER 396

An Act concerning payment of Crime Compensation Board assessments and supplementing Title 30 of the Revised Statutes.

BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:

C.30:4-15.1 Collection of "VCCB Surcharge" by commissary in correctional facility.

1. Every commissary in a county or State correctional facility operated for the sale of commodities shall collect a surcharge of 10% of the sales price of every item sold. The surcharge shall be known as the "VCCB Surcharge." All funds collected pursuant to this section shall be forwarded to the State Treasurer for deposit in the Victims of Crime Compensation Board Account, shall be subject to reporting and accounting procedures pursuant to the provisions of section 2 of P.L. 1979, c.396 (C.2C:43:3.l) and shall be used in satisfying claims pursuant to the provisions of the "Criminal Injuries Compensation Act of 1971," P.L. 1971, c.317 (C.52:4B-1 et seq.). A sale subject to surcharge under this section shall not be subject to any tax imposed under the "Sales and Use Tax Act," P.L. 1966, c.30 (C.54:32B-1 et seq.).

2. This act shall take effect immediately but section 1 shall remain inoperative until the 180th day following enactment.

Section 30:4-15.1 was enacted in January of 1998 and went into effect in July of that year. Between August and December of 1998 ten lawsuits asserting, inter alia, the invalidity of S 30:4-15.1 were filed in the District Court pursuant to 42 U.S.C. S 1983. The plaintiffs-- one of whom was Mr. Myrie and another of whom was Mr. White-- in these several lawsuits were all persons incarcerated in state or county prisons in New Jersey. The defendants were state

officials, led by (then) Governor Whitman. The District Court consolidated the several lawsuits for the limited purpose of dealing in unified fashion with their common ingredient -- the constitutional claims involvingS 30:4-15.1. The federal constitutional claims were that the statute violated the double jeopardy, ex post facto, bill of attainder, and excessive fines clauses1, and also deprived the plaintiffs of due process and equal protection. The state constitutional claims were based on those provisions of the New Jersey Constitution that are counterparts of the federal constitutional clauses.2 On cross-motions for summary judgment with respect to those common constitutional claims, the District Court, in a thoughtful and comprehensive opinion, granted summary judgment in

---

1. Article I, Section 10 of the United States Constitution bars states from "pass[ing] any Bill of Attainder [or] ex post facto Law." The double jeopardy and excessive fines clauses are, in terms, constraints on the federal government ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb," Fifth Amendment), ("nor excessive fines imposed," Eighth Amendment), but both constraints are deemed to apply to state governments as well via the Fourteenth Amendment.

2. Art. 4, S 7, P 3: "The Legislature shall not pass any bill of attainder, ex post facto law . . ." Art. I, S 12:". . . [E]xcessive fines shall not be imposed . . ." Art. I, S 11: "No person shall, after acquittal, be tried for the same offense."

The foregoing state constitutional provisions appear to cover the same ground as the corresponding federal constitutional provisions. See, e.g., Doe v. Poritz, 142 N.J. 1, 68-69, 662 A.2d 367, 388 (1995) (bill of attainder and ex post facto); New Jersey v. Williams, 669 A.2d 867, 873-74 (N.J. Super. 1995) (excessive fines). The wording of Article I, S 11 of the New Jersey Constitution, which in terms is confined to prior acquittals, is narrower than the wording of the Fifth Amendment's double jeopardy clause but has the same coverage. New Jersey v. Widmaier, 157 N.J. 475, 490, 492-94, 499-500 (1999).

The Fourteenth Amendment's guarantees of due process and equal protection are equatable with, respectively, Article I, S 1 and Article I, S 5 of the New Jersey Constitution. The New Jersey constitutional provisions do not track the Fourteenth Amendment's language but they appear to have the same content. See Washington Nat'l Ins. Co. v. Board of Review, 1 N.J. 545, 553, 64 A.2d 443, 446 (1949); Auto-Rite Supply Co. v. Mayor and Township Committeemen, 142 A.2d 612, 616-17 (N.J. Super. 1956).

favor of the defendants. Thereafter, because (unlike some of the other lawsuits) the lawsuits brought by Mr. Myrie and Mr. White advanced no other claims, final judgment was entered against Mr. Myrie and Mr. White. They have both appealed.

I. Double Jeopardy, Ex Post Facto, and Bill of Attainder

The double jeopardy, ex post facto, and bill of attainder provisions are discrete constitutional protections addressed to distinct types of impermissibly oppressive governmental constraints. But they have a common thread: they only apply to those situations in which the injury complained of constitutes an imposition or exaction of a "criminal" rather than a "civil" nature. See Rex Trailer Co. v. United States, 350 U.S. 148, 154 (1956).

In Hudson v. United States, 522 U.S. 93 (1997), a case in which the Supreme Court rejected a contention that criminal prosecutions undertaken following the imposition of sanctions imposed by a civil regulatory agency constituted double jeopardy, the Court (speaking through Chief Justice Rehnquist, and building upon its earlier decision in Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963)), formulated the pertinent analytic scheme in the following terms:

> Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. Helvering [v. Mitchell, 303 U.S. 391], 399[(1938)]. A court must first ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." [United States v.] Ward, 448 U.S. 242, 248 [(1980)]. Even in those cases where the legislature "has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect," id., at 248-249, as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty," Rex Trailer Co. v. United States, 350 U.S. 148, 154 (1956).

> In making this latter determination the factors listed in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-

5

169 (1963), provide useful guideposts, including: (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4)"whether its operation will promote the traditional aims of punishment–retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned." It is important to note, however, that "these factors must be considered in relation to the statute on its face," id., at 169, and "only the clearest proof " will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty. Ward, supra at 249 (internal quotation marks omitted).

522 U.S. at 99–100.

In the cases under review the District Court examined the double jeopardy, ex post facto, and bill of attainder challenges to S 30:4–15.1 through the prism of the Court's opinions in Hudson and Mendoza–Martinez . On appeal the parties agree that Hudson/Mendoza–Martinez is the appropriate constitutional template, but appellants (Junior Myrie and Norwood White) argue that the District Court misapplied it, while appellees (the State officials) argue that the District Court got it right.

We concur in the parties' acknowledgment that Hudson/Mendoza–Martinez is the proper rubric. We turn now to the application of its principles to appellants' claims.

A. Did the New Jersey Legislature intendS 30:4–15.1 to be a "civil" imposition or a "criminal" one?

As the Chief Justice explained in Hudson,"[w]hether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction . . . . A court must first ask whether the legislature, `in establishing the penalizing mechanism, indicated either expressly or

6

impliedly a preference for one label or the other.' " 522 U.S. at 99. F

In Auge v. New Jersey Dep't of Corrections, 743 A.2d 315 (N.J. Super. 2000), a case decided shortly after the District Court's dismissal of appellants' claims, the Appellate Division of the New Jersey Superior Court rejected a New Jersey prison inmate's contention that Chapter 396 of the Laws of 1997 -- codified as S 30:4-15.1-- contravened his double jeopardy, ex post facto, and due process rights. The Auge court's opinion provides an instructive summary of the events -- going back to 1971 -- that led to the enactment of S 30:4-15.1:

> In 1971, the Legislature enacted the Criminal Injuries Compensation Act (the Act). L. 1971, c. 317, N.J.S.A. 52:4B-1 to 21. "The primary purpose of the Act is to provide compensation to persons who have suffered bodily injury from the commission of a serious crime." White v. Violent Crimes Compensation Bd., 76 N.J. 368, 386, 388 A.2d 206 (1978). However, the Legislature failed during the 1970s to appropriate sufficient funds to provide adequate and timely compensation to violent crimes victims in accordance with the Act. See Assembly Judiciary Law, Public Safety & Defense Committee, Statement to Assembly Bill No. 3648 (194 N.J. Leg., 2d Sess. 1979) (noting that as of 1977"the number of claims as well as insufficient funding[had] created a situation where a claimant [had] to wait up to 3 years before receiving relief "). To establish an additional source of funding, the Legislature enacted Chapter 396 of the Laws of 1979 (N.J.S.A. 2C:43-3.1), which required any person convicted of any crime or other enumerated offense to be assessed a penalty ranging from $25 [FN1] to $10,000 and directed that the money collected from the penalty be deposited in a separate account for the compensation of victims of violent crimes. However, the penalties imposed under this legislation still failed to generate sufficient revenue to fully fund the program because they often could not be collected. Sponsor's Statement to S.2082 (207th N.J. Leg., 2d Sess. 1997).

7

FN1. The minimum amount of the penalty has since been increased to $50. L. 1991, c. 329, S 3.

In an effort to make up for this continuing shortfall in the funding required to compensate the victims of violent crimes, the Legislature enacted Chapter 396 of the Laws of 1997 [S 30:4-15.1] which imposes a 10% surcharge upon the price of all commodities purchased in prison commissaries and directs that money collected from this surcharge be deposited in the Victims of Crime Compensation Board Account. The Assembly Appropriation Committee's statement concerning the bill notes that:

The VCCB [Violent Crimes Compensation Board] surcharge authorized under this bill is expected to generate between $1.2 and $1.5 million annually for the VCCB. When coupled with federal matching funds, the VCCB should have approximately $2 million in new moneys available to compensate crime victims [Assembly Appropriations Committee, Statement to Senate Committee Substitute for S.2082 (207th N.J. Leg., 2d Sess. 1977).]

743 A.2d at 317.

The statement of the Assembly Appropriations Committee quoted in Auge was dated December 11, 1997. On December 16, a "fiscal note" on the pending bill enlarged on the statement of the Assembly Appropriations Committee. The fiscal note explained why the statutory surcharge was to be imposed on all inmate purchases, not just on purchases by inmates who still owed money to the Victims of Crime Compensation Board (VCCB): according to the fiscal note, developing a computer system capable of identifying the inmates owing money to the VCCB would have been prohibitively expensive. The fiscal note also pointed out that exempting correctional facility commissary sales from New Jersey's sales tax -- then, as now, 6% -- would reduce the aggregate anticipated annual surcharge revenue of $1,000,000 by "up to" $600,000. 3

(Text continued on page 10)

_____

3. The full text of the fiscal note is as follows:

8

Fiscal Note to Senate Committee Substitute for Senate No. 2082
State of New Jersey – Dated: December 17, 1997

Senate Committee Substitute for Senate Bill No. 2082 of 1997
imposes a 10 percent surcharge on all commissary sales in State
and county correctional facilities in order to generate additional
revenues to compensate crime victims pursuant to the"Criminal
Injuries Compensation Act of 1971," P.L. 1971, c.317 (C52:4B-1 et
seq.) or any other law. The bill also provides that any sales subject
to the surcharge would not be subject to sales tax.

Every defendant found guilty of a criminal offense is required by
law to pay an assessment to the Victims of Crime Compensation
Board (VCCB). The moneys paid into the VCCB's account are used
to provide compensation to the victims of crime. However, although
every defendant is assessed a penalty payable to the VCCB, not all
of those assessments are paid.

The Department of Corrections states that about $10 million is
spent by State prisoners on commissary purchases each year. The
department notes that it is not clear whether the 10 percent
surcharge would be added to every commissary purchase regardless
of whether an inmate owes VCCB assessment or not. Although the
department is unable to estimate the cost of implementing this
program, it states that if only inmates who owe VCCB assessments
are subject to the surcharge, it would be required to identify the
specific inmates and the amount of unpaid assessment for both
current and prior convictions. Current computer systems lack the
ability to identify and track VCCB assessment or any other revenue
categories. Modification of software would be extremely costly, and
even with the modifications, insufficient capacity for data storage
would prohibit the ability to operate such a system. A manual
system for researching and tracking assessments and payments
would not be feasible.

The Office of Legislative Services (OLS) notes that if the
assessment is placed on all inmate commissary purchases
regardless of the amount owed per inmate, the department would
simply be required to increase the product prices by 10 percent, for
total annual collections of about $1 million, to be transferred to the
VCCB for the payment of claims. The OLS also notes that the
elimination of the requirement to pay sales tax on certain items
would reduce State revenue by up to $600,000 per year. The cost of
implementing such a program should be minimal.

9

We think that the history of S 30:4-15.1 (the Auge court's description of its provenance, together with the recital of the Assembly Appropriations Committee and the supplementary fiscal note) convincingly demonstrates that the intent of the Legislature was to put in place a civil remedial program: a program designed to generate funds that would help New Jersey fulfill its long-standing but only partially realized commitment to compensate crime victims, not a program designed to add further punishment to those incarcerated.

To be sure, this history does not specify why the Legislature looked to prison inmates as the source of the needed revenues. It would seem, however, not unreasonable to infer that the Legislature regarded the inmate population as a cohort whose members were in large measure accountable for the victim harms for which adequate compensation had not been achieved.

Such a legislative attribution of accountability-- assuming it was, in fact, made -- would not, of course, be flawless. As pointed out by the fiscal note, the program adopted by the Legislature contemplated that the surcharge would be added to the price of all inmate purchases, including purchases by inmates who had already completed payment of sums owing to the VCCB. Also, the New Jersey inmate population presumably included -- and continues to include -- persons held in pre-trial custody, not convicted of any crimes. But this lack of one-to-one correspondence between a particular inmate's purchase and an identifiable and precisely quantifiable dollar obligation to a victim does not undercut the general rationality of the attribution of accountability which, we assume, animated the Legislature. More to the point, it does not undercut the conclusion that the surcharge regime was intended by the Legislature to be civil and remedial.

---

This fiscal note has been prepared pursuant to P.L. 1980, c.67.

B. Does application of the seven Mendoza-Martinez
      factors mark S 30.4-15.1 as so punitive in effect as to
      transform the statutory surcharge it authorizes into a
      criminal punishment?

In Section I (A) of this opinion we concluded that the text
and history of S 30:4-15.1 show it to have been intended by
the New Jersey Legislature to be a civil remedial program,
not a program intended to enhance the punishment of
persons incarcerated in New Jersey's state and county
prisons.

We now address the second question posed by the
Hudson Court. That second question is whether,
notwithstanding that "the legislature `has indicated an
intention to establish a civil penalty . . . the statutory
scheme was so punitive either in purpose or effect' . . . as
to `transfor[m] what was clearly intended as a civil remedy
into a criminal penalty.' " 522 U.S. at 99. In aid of that
inquiry, the Supreme Court pointed lower courts to seven
criteria identified in Mendoza-Martinez.

As previously noted, the seven Mendoza-Martinez  criteria
are as follows:

      Whether the sanction involves an affirmative disability
      or restraint, whether it has historically been regarded
      as a punishment, whether it comes into play only on a
      finding of scienter, whether its operation will promote
      the traditional aims of punishmen-retribution and
      deterrence, whether the behavior to which it applies is
      already a crime, whether an alternative purpose to
      which it may rationally be connected is assignable for
      it, and whether it appears excessive in relation to the
      alternative purpose assigned are all relevant to the
      inquiry, and may often point in differing directions.

Mendoza-Martinez, 372 U.S. at 168-69.

The "sanction" challenged in our case is a 10% surcharge
added by state law to the price of retail purchases at New
Jersey state and county prison commissaries. It has all the
earmarks of a sales tax. Indeed, it replaces the sales tax
that New Jersey imposes on purchases made in ordinary
retail stores throughout the state. As of the time period

11

covered by this litigation, the New Jersey sales tax has been 6% -- except for those categories of retail items, primarily food, clothes and prescription drugs, that New Jersey law exempts from sales tax. Thus the effective "sanction" is a commissary price increment of 10% for items that would be exempt from sales tax at a retail store, while for other items the commissary price increment is 4% (i.e., 10% - 6%).4

The first Mendoza-Martinez inquiry is whether the asserted sanction is an "affirmative disability or restraint." The phrase apparently derives from the Court's opinion in Flemming v. Nestor, 363 U.S. 603 (1960). In that case the Court upheld, against constitutional challenge, the termination, pursuant to S 202(n) of the Social Security Act, of old-age benefits of an alien deported for past Communist Party membership. Among the grounds for constitutional challenge were contentions "that the termination of appellee's benefits amounts to punishing him without a judicial trial, see Wong Wing v. United States, 163 U.S. 228; that the termination of benefits constitutes the imposition of punishment by legislative act, rendering S 202(n) a bill of attainder, see United States v. Lovett, 328 U.S. 303; Cummings v. Missouri, 4 Wall. 277; and that the punishment exacted is imposed for past conduct not unlawful when engaged in, thereby violating the constitutional prohibition on ex post facto laws, see Ex parte Garland, 4 Wall. 333." 363 U.S. at 613. The Flemming v. Nestor Court went on to observe that "[e]ssential to the success of each of these contentions is the validity of characterizing as `punishment' in the constitutional sense the termination of benefits under 202(n)." Id. In the course of its extended discussion of whether the challenged sanction was a " `punishment' in the constitutional sense," the Court observed that "[h]ere the sanction is the mere denial of a noncontractual governmental benefit. No affirmative disability or restraint is imposed, and certainly

_____

4. The fact that exempting commissary sales from sales tax was expected by the authors of the "fiscal note", see supra, note 3, to result in an effective reduction of "up to" $600,000 of the anticipated aggregate annual surcharge revenue of $1,000,000, suggests that somewhat over 50% of commissary purchases are of items which, at ordinary retail stores, would be subject to sales tax.

12

nothing approaching the `infamous punishment' of imprisonment, as in Wong Wing, on which great reliance is mistakenly placed." Id. at 617.5

_____

5. The Court in Flemming v. Nestor was unable to equate the termination of old-age benefits with the " `punishment' in the constitutional sense" found by the Court in (1) Wong Wing (invalidating federal statute providing for up to a year's imprisonment at hard labor for Chinese aliens found, at trial without a jury, to be unlawfully in the United States), (2) Lovett (invalidating federal statute terminating the compensation, and hence the further employment, of three named federal employees found by the House Appropriations Committee to be "subversive"), (3) Cummings (invalidating post-Civil War state constitutional provision prohibiting, inter alia, clergymen from pursuing their ministry unless they took an oath that they had never been disloyal to the government of the United States), and (4) Garland (invalidating similar post-Civil War federal statute directed at lawyers).

In Lovett, the Court, speaking through Justice Black, found Cummings and Garland to be controlling authority. Justice Black's characterization of Cummings and Garland is instructive:

> In Cummings v. Missouri, 4 Wall. 277, 323, this Court said, "A bill of attainder is a legislative act which inflicts punishment without a judicial trial. If the punishment be less than death, the act is termed a bill of pains and penalties. Within the meaning of the Constitution, bills of attainder include bills of pains and penalties."
> The Cummings decision involved a provision of the Missouri Reconstruction Constitution which required persons to take an Oath of Loyalty as a prerequisite to practicing a profession. Cummings, a Catholic Priest, was convicted for teaching and preaching as a minister without taking the oath. The oath required an applicant to affirm that he had never given aid or comfort to persons engaged in hostility to the United States and had never "been a member of, or connected with, any order, society, or organization, inimical to the government of the United States . . ." In an illuminating opinion which gave the historical background of the constitutional prohibition against bills of attainder, this Court invalidated the Missouri constitutional provision both because it constituted a bill of attainder and because it had an ex post facto operation. On the same day the Cummings case was decided, the Court in Ex parte Garland, 4 Wall. 333, also held invalid on the same grounds an Act of Congress which required attorneys practicing before this Court to

take a similar oath. Neither of these cases has ever been overruled.

They stand for the proposition that legislative acts, no matter what

their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution.

Since the withdrawal of old-age benefits challenged in Flemming v. Nestor was found not to constitute an "affirmative disability or restraint," it is plain that the comparatively minor imposition complained of on this appeal cannot be so characterized.

Having determined that the statutory 10% surcharge on prison commissary sales is not "an affirmative disability or restraint," we find it possible to address with greater expedition the balance of the Mendoza-Martinez criteria. Thus, to state the question "whether [such a surcharge] has historically been regarded as a punishment", 372 U.S. at 168, is, manifestly, to answer that question in the negative. Similarly, it is plain that the addition of a surcharge to the price of a retail purchase is not an event that "comes into play only on a finding of scienter." Id. Nor is there ground for supposing that the imposition of a 10% surcharge on commissary purchases "will promote the traditional aims of punishment -- retribution and deterrence." Id. Further, it is not the case that "the behavior to which it [the surcharge] applies" -- namely, purchasing items at a commissary -- "is already a crime." Id.

The sixth Mendoza-Martinez criterion is "whether an alternative purpose to which [the asserted "sanction"] may rationally be connected is assignable for it." Id. at 168-69. We understand this criterion to inquire whether an asserted "sanction" may be reasonably regarded as having a purpose other than punishment. The answer is that, as explained in the discussion of the history of S 30:4-15-1 in section I (A) of this opinion, the stated legislative intention in providing for the surcharge was to generate additional funds for disbursement by the underfunded VCCB.

Finally, Mendoza-Martinez inquires "whether [the asserted sanction] appears excessive in relation to the alternative purpose assigned." 372 U.S. at 169. Given that "the alternative purpose assigned" by the Legislature was to rescue the underfunded VCCB, the anticipated annual revenue from the 10% surcharge of between $1,200,000 and $1,500,000 (potentially augmented by matching federal funds) has not been shown to be excessive. Nor is there any persuasive showing that the 10% surcharge is excessive when considered from the perspective of the inmate-

14

purchasers: an addition of up to 10% to the price of a retail item may certainly be obnoxious (and, indeed, might well serve as a substantial disincentive to purchase expensive items -- e.g., electronic equipment, automobiles, household appliances, works of art -- of a sort not likely to be sold at a prison commissary), but such an increment cannot be perceived as skewing the commissary price structure in radical fashion; moreover, as noted above, the effective price increase for many commissary items is in fact not 10%, but 4%, since the 6% sales tax that would attach to numerous items in non-prison retail stores is not applicable to prison commissary sales.6

Thus, we distill out of the seven Mendoza-Martinez criteria no support for the proposition that the surcharge is " `so punitive either in purpose or effect'. . . as to `transfor[m] what was clearly intended as a civil remedy into a criminal penalty.' " Hudson, 522 U.S. at 99. And, in light of the Court's instruction that the Mendoza-Martinez " `factors must be considered in relation to the statute on its face' and `only the clearest proof ' will suffice to override legislative intent and transform what has been denominated a civil penalty into a criminal penalty," Hudson, 522 U.S. at 100, we conclude that the surcharge authorized by S 30:4-15.1 does not constitute " `punishment' in the constitutional sense" and hence its imposition on purchases made by appellants at prison commissaries does not offend the double jeopardy, bill of attainder, or ex post facto clauses of the federal Constitution. Given that the cognate provisions of the New Jersey Constitution have essentially the same meaning as their federal counterparts, supra notes 1 and 2, appellants' claims pursuant to the New Jersey provisions are also unavailing.

II. Excessive Fines

As noted earlier in this opinion, both the Eighth Amendment of the federal Constitution and Article I,S 12 of the New Jersey Constitution bar the imposition of "excessive fines," and these identical phrases have been

_____

6. See text at note 4, supra.

15

construed to have the same content. Supra notes 1 and 2. Although, as a general matter, the prohibition on"excessive fines" is a limitation on "the government's power to extract payments, whether in cash or in kind, as punishment for some offense," Austin v. United States, 509 U.S. 601, 609–10 (1993), the prohibition is not confined to exactions imposed as an aspect of the criminal law enforcement process. See id. at 607–08. A civil imposition, such as a civil forfeiture, which is adjudged "excessive," would fall within the purview of the constitutional bar. But, as we have noted in our discussion of the Martinez–Mendoza criteria, the 10% surcharge challenged by appellants is not "excessive" when viewed in the context of the reasons for its enactment. Accordingly, we conclude that appellants' claim that the surcharge constitutes an "excessive fine" is without merit.

III. Due Process and Equal Protection

We turn, finally, to appellants' contentions that the surcharge offends the federal due process and equal protection guarantees as well as their New Jersey constitutional counterparts. Appellants' due process argument proceeds along two alternative lines:

First, appellants "submit that . . . the statutory surcharge is not rationally related to the purportedly legitimate governmental interest of bridging the funding gap for the Victims of Crime Compensation Board . . . Assuming this to be a `legitimate' governmental purpose, [appellants] contend that the rational `means' to achieve that purpose would be to establish a more effective collection mechanism, to secure payments from those defendants obliged under court orders to pay same, rather than to allocate responsibility for `filling the funding gap' to a class of individuals defined only by their status as inmates and not by any claimed status as VCCB `obligors.' "

It cannot be doubted that "establish[ing] a more effective collection mechanism" for the sums owed by "VCCB `obligors' " would be a "rational `means' " to augment VCCB revenues. Conceivably, indeed, such a "more effective collection mechanism" would harvest revenue more quickly

than the challenged surcharge. But the due process clause does not authorize courts to exercise oversight with respect to the comparative efficiency, and/or relative wisdom, of the particular measure or measures that a legislature selects from a menu of possible measures reasonably calculated to achieve a permissible legislative objective. Provided that the measure selected by the legislature is reasonably calculated to bring about in some significant degree the achievement of an appropriate legislative goal, the legislature's choice of measures is not open to judicial second-guessing.

Second, arguing in the alternative, appellants submit that "[w]hile the statute may have a purported`permissible legislative purpose,' nonetheless, the arbitrary and capricious classification of inmates as the only group responsible for serving that purpose, vitiates any possibility of finding `a real and substantial relationship' between the `means' selected by the statute and its proffered`legislative purpose'."

The flaw in this prong of appellants' due process argument inheres in appellants' characterization of the "classification of inmates as the only group responsible for serving that [legislative] purpose" as"arbitrary and capricious." We have pointed out, in Section I (A) of this opinion, that "[i]t would seem . . . not unreasonable to infer that the Legislature regarded the inmate population as a cohort whose members were in large measure accountable for the victim harms for which adequate compensation had not been achieved." And, after noting the likelihood that some fraction of the inmate population would not, in fact, owe anything to the VCCB, we stated that "this lack of one-to-one correspondence between a particular inmate's purchase and an identifiable and precisely quantifiable dollar obligation to a victim does not undercut the general rationality of the attribution of accountability which, we assume, animated the Legislature."

Appellants' equal protection claim is, in essence, an extension and refinement of the due process claim, just addressed, that the Legislature's selection of prison inmates to bear the entire burden of the surcharge was "arbitrary and capricious." According to appellants, "[n]ot only is the nexus between the statutory means and the proffered

17

government interest irrational . . . the statutory classification of affected individuals is likewise irrational and arbitrary, thereby constituting a violation of the Equal Protection Clause. A law such as N.J. Stat. Ann. 30:4-15.1, that creates a `wholly arbitrary' classification cannot withstand judicial scrutiny when it manifests prejudice against `discrete and insular minorities' (such as prisoners), according to Justice Stone's famous footnote in United States v. Carolene Products, 304 U.S. 144, 151 n.4 (1938)."

Appellants' argument reaches too far. Prisoners, taken in the large, are not a "discrete and insular minorit[y]." They are not a "suspect classification." Hundreds of statutes and administrative regulations, both state and federal, deal comprehensively and in detail with persons who are incarcerated, and, in the main, they are deemed to be as presumptively constitutional as other legislative and administrative directives.

On the other hand, we appreciate that there could be circumstances in which a statute or regulation that has valid application to an aggregate prison population the generality of whom are, like appellants, convicted felons, might nevertheless be open to challenge as applied to particular inmate sub-groups who do not share the characteristics that justify the constraints imposed by the challenged statute or regulation on the general prison population. But appellants, in challenging S 30:4-15.1, do not present themselves -- and, indeed, would lack standing to present themselves -- as champions of a hypothetical inmate sub-group. They challenge the statute comprehensively, and their challenge fails.

IV. Conclusion

For the foregoing reasons -- reasons which in substantial measure track the careful opinion of the District Court -- the judgments of the District Court granting summary judgment dismissing appellants' claims are affirmed.

18

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

19