NOT DESIGNATED FOR PUBLICATION

Nos. 116,349
117,121

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FLOYD W. PEW, JR., et al.,
*Appellants*,

v.

TIM KECK, Interim Secretary of the
Kansas Department for Aging and Disability Services, et al.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Pawnee District Court; BRUCE T. GATTERMAN, judge. Opinion filed November 17, 2017. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellants.

*Lindon A. Allen*, appellant pro se.

*Lori Dougherty-Bichsel*, senior litigation counsel, Kansas Department for Aging and Disability Services, for appellees.

Before SCHROEDER, P.J., MCANANY and POWELL, JJ.

PER CURIAM: Floyd W. Pew Jr. and 24 other patients of the Sexual Predator Treatment Program (SPTP) appeal the district court's denial of their K.S.A. 60-1501 petitions. The patients complain that the Kansas Department of Aging and Disability Services' (KDADS) vendor limitations policy eliminated their ability to order or receive consumable products from any source other than an approved vendor. Pursuant to the

1

remand order from this court, the district court ordered KDADS to conduct due process hearings for each patient complaining about the vendor limitation policy. Upon completion of those hearings, the district court heard evidence and held that (1) the patients received adequate procedural due process during their grievance hearings and (2) the patients' substantive due process rights were not violated by KDADS's vendor limitations policy because it had a legitimate government interest in the safety and treatment of the patients in the SPTP. On appeal, the patients challenge these findings. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This case originally involved 96 individuals civilly committed to the SPTP pursuant to K.S.A. 2016 Supp. 59-29a01 *et seq.* On September 23, 2011, Pew and the other 95 named petitioners filed individual K.S.A. 60-1501 petitions in the Pawnee County District Court, alleging that their constitutional rights were violated by the SPTP's limiting of the number of vendors from which patients could order consumable items and that the SPTP failed to provide them adequate due process in considering their complaints concerning the vendor limitation policy.

The district court consolidated the patients' petitions and issued a writ of habeas corpus, prompting KDADS, which runs the SPTP, to file a motion to dissolve the writ. On March 7, 2013, the district court issued a Memorandum Decision and Order dismissing the patients' claims. They then appealed the dismissal to this court.

On June 27, 2014, another panel of this court remanded the case to the district court. *Pew v. Sullivan*, 50 Kan. App. 2d 106, 114, 329 P.3d 496, *rev. denied* 299 Kan. 1270 (2014). That panel held that the patients should be appointed counsel and that they had a property interest in their right to receive mail and to spend their money. 50 Kan. App. 2d at 113-14. The panel held that the patients were entitled to due process hearings

2

in compliance with K.S.A. 2015 Supp. 59-29a22(c) before their rights to receive items in the mail and purchase consumables through vendors could be restricted. The case was remanded for the appointment of counsel and the conducting of due process hearings in compliance with K.S.A. 2015 Supp. 59-29a22. 50 Kan. App. 2d at 111-14.

On remand, the patients were appointed counsel and the district court ordered KDADS to provide due process hearings to each complaining patient in the SPTP. After these hearings were held, the district court then conducted a trial concerning the patients' petitions. Six of the patients testified regarding their grievances, and 10 SPTP employees testified regarding the purpose of the vendor limitation policy and their roles in providing the due process hearings to each patient.

On July 22, 2016, the district court denied the patients' petitions, holding that the due process afforded to the patients on remand was sufficient. It further held that the vendor limitations policy was rationally related to legitimate governmental purposes—to reduce the introduction of contraband into the facility, to protect the therapy of the patients, as well as to ensure the safety and security of the patients and staff—and that the policy was not arbitrary. The patients now timely appeal from this latest order of the district court.

We note that only 25 of the original 96 patients have joined this appeal. Included in this group is Lindon A. Allen, who docketed his own pro se appeal with this court. We have consolidated these appeals.

On appeal, the patients make two arguments: (1) Their procedural due process rights were violated by KDADS and (2) their substantive due process rights were violated by KDADS's vendor limitations policy. Additionally, Allen makes several other arguments on appeal not presented to the district court.

Before we address the substance of the patients' arguments, we must first deal with Allen's claims because he raises several additional arguments both of a constitutional and nonconstitutional nature. In addition to reiterating the other patients' arguments, Allen argues for the first time on appeal that (1) the vendor limitations policy violates and restricts the patients' First Amendment right to a familial relationship; (2) the search of the incoming mail violates the patients' Fourth Amendment rights; (3) KDADS took retaliatory action after the filing of the patients' petitions in violation of their First Amendment rights; and (4) the district court lacks the authority to substitute itself for KDADS in due process hearings.

Issues not raised before the district court cannot be raised on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). Moreover, constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court for review. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 728-29, 317 P.3d 70 (2014). Supreme Court Rule 6.02(a)(5) (2017 S. Ct. R. 35) states: "If the issue was not raised below, there must be an explanation why the issue is properly before the court." Our Supreme Court has emphasized that "Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); see *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including that "'the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case [or that] consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights.'" *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008) (quoting *State v. Kirtdoll*, 281 Kan. 1138, 1149, 136 P.3d 417 [2006]), *cert. denied* 555 U.S. 1178 (2009). The party raising the issue for the first time on appeal must specifically invoke an exception. *State v. Godfrey*, 301 Kan. at 1043. Because Allen does not specifically invoke an exception that allows him to raise

4

these arguments for the first time on appeal, his failure to do so constitutes an abandonment of such issues and we will not consider them.

We turn now to the patients' claims which are properly before us. Each argument will be addressed in turn, and our standard of review is the same for each.

"[A] person confined in the SPTP is included within the purview of K.S.A. 60-1501 and, as a result, may bring a habeas corpus petition alleging due process violations." *Johnson v. State*, 289 Kan. 642, 648, 215 P.3d 575 (2009). "To avoid summary dismissal of a K.S.A. 60-1501 petition, the petitioner's allegations must be of shocking and intolerable conduct or continuing mistreatment of a constitutional stature." 289 Kan. at 648. We review a district court's decision on the merits of a K.S.A. 60-1501 petition to determine whether the district court's factual findings are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. "The district court's conclusions of law are subject to de novo review." *Hooks v. State*, 51 Kan. App. 2d 527, 530, 349 P.3d 476 (2015); see *Rice v. State*, 278 Kan. 309, 320, 95 P.3d 994 (2004).

DID KDADS VIOLATE THE PATIENTS' PROCEDURAL DUE PROCESS RIGHTS?

When this case was before this court the first time, the patients argued that KDADS infringed on their liberty interests in their right to receive mail and their right to spend their money. That panel held that the patients' right to receive mail was improperly denied without a due process hearing:

> "SPTP is correct in arguing Residents' right to mail is not absolute. K.S.A. 2013 Supp. 59-29a22(b)(15)(B)(i)-(iii). However, the plain language of K.S.A. 2013 Supp. 59-29a22(c) indicates '[a] patient's rights guaranteed under subsections (b)(15) to (b)(21) may be denied for cause *after review*.' (Emphasis added.) Here, the right to receive mail

5

has been denied without providing a treatment or security-related reason for creating the restricted vendor policy, and there has never been a review to establish cause to deny Residents their purchasing opportunities such as provided by K.S.A. 2013 Supp. 59-29a22(b)(22). SPTP, by restricting Residents' number of possible vendors, has limited their right to receive items in the mail without a due process hearing pursuant to K.S.A. 2013 Supp. 59-29a22(c)." *Pew*, 50 Kan. App. 2d at 111.

The panel then remanded the case with the following instructions:

"The district court improperly granted the summary disposition of the habeas corpus petitions. SPTP must follow the statutory provisions, including their due process rights, under K.S.A. 2013 Supp. 59-29a22 when limiting Residents' statutory and constitutional right to purchase consumable items and to spend money as they choose. We remand to the district court for proceedings to reconsider the petitions for writ of habeas corpus in accordance with this opinion and for the district court to appoint counsel to represent Residents. [Citation omitted.]" 50 Kan. App. 2d at 114.

Because this court previously found that K.S.A. 2013 Supp. 59-29a22(b)(15) and K.S.A. 2013 Supp. 59-29a22(c) guarantee the patients procedural due process before their right to receive mail is denied or altered, our duty is to determine whether the process afforded to the patients on remand was sufficient. See *Murphy v. Nelson*, 260 Kan. 589, 598, 921 P.2d 1225 (1996). "[P]rocedural due process . . . requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Village Villa v. Kansas Health Policy Authority*, 296 Kan. 315, 331, 291 P.3d 1056 (2013).

Here, the patients argue that their opportunity to be heard was not meaningful. In support of their argument, they make three contentions: (1) The hearing officers did not receive training; (2) there was a 15-minute time limit set on the hearings for each patient; and (3) the discussions between the hearing officers and the patients did not contain any meaningful dialogue. Additionally, Allen separately argues that the hearing officers were

6

not impartial and, therefore, the process provided was insufficient. It is undisputed that the patients each received notice of his or her hearing.

First, the hearing officers did receive training. The hearing officers were impartial magistrates who did not have any professional contact with the SPTP and the patients before the hearings. Four of the hearing officers testified before the district court, and all four indicated that they had received training on their role as a hearing officer. Although they did not receive "in-depth training," they were instructed during their in-person training session that their role was to make sure the patients were heard; that their decisions were to be independent and fair; and that after listening to the patients and considering what they presented, they were to make a decision to affirm, reverse, or modify the action taken on the patients' rights after the hearing. The hearing officers were not pressured to reach any decision based on their conversations with the patients. The selected hearing officers received instruction as to what "due process" meant and were not told what decision to make. We consider such training adequate for the informal hearing required by K.S.A. 2013 Supp. 59-29a22(c).

Second, contrary to the patients' assertions, there was no testimony that the patients were limited to a 15-minute hearing, only that the hearings were scheduled every 15 minutes. One hearing officer specifically testified there was "no pressure to finish in any time." Another hearing officer testified that she recalled one of the patients who only took a couple of minutes in his hearing and she asked him multiple times if he had anything else to say before concluding the hearing. Hearing officers could have taken longer than the 15 minutes scheduled for each hearing. Further, several patients testified regarding the informal hearings they received. Mark Dowling testified he was not advised of a time limit to his hearing. He ended his hearing by walking out of the room and stating he did not have anything further to say. Vance Walters testified his hearing lasted "roughly under a half hour" and that he had the opportunity to fully express himself during the hearing. Rodney Callow testified that he also was not advised of a time limit

7

on the hearing and that it lasted about 15 minutes. Significantly, the patients cannot point to any support in the record that indicates that they were cut off when the hearing exceeded 15 minutes. We see no error in either the scheduling or in the time given for the due process hearings.

Third, it is clear that the discussions between the hearing officers and the patients were meaningful. Patients testified that they believed their hearing officers were attentive, took notes, asked questions, and allowed them to fully express themselves. Most notably, as a result of these hearings, KDADS eliminated a vendor that the patients were not pleased with and added several additional vendors, raising the total from three to seven approved vendors, including Walmart and Walgreens. These hearings were obviously meaningful and even prompted a modification of the vendor limitations policy.

Finally, Allen separately argues that these hearings were not conducted by impartial hearing officers. But as we have previously discussed, the hearing officers were specifically selected because they did not have professional contact with the patients. Further, there is no support in the record that the hearing officers had made their decisions before they conducted the hearings, and Allen points to no such evidence. From a review of the record on appeal, it is clear that the hearing officers were impartial.

The patients received notice of their hearings, and the hearings provided the patients a meaningful opportunity to be heard at a meaningful time and in a meaningful manner. KDADS did not violate the patients' procedural due process rights.

DID KDADS VIOLATE THE PATIENTS' SUBSTANTIVE DUE PROCESS RIGHTS?

The patients also argue that their substantive due process rights were violated because they could not get desired items from the three vendors at the time their petitions were filed or the items could only be ordered through an unapproved vendor.

Substantive due process claims derive from a "narrow range of fundamental liberty interests [such as] the right to bear and raise children, the right to marry, and various other rights closely allied with those explicitly guaranteed in the Bill of Rights." *Taylor v. Kansas Dept. of Health & Environment*, 49 Kan. App. 2d 233, 244, 305 P.3d 729 (2013); see *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998); *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). "Substantive due process protects an individual from arbitrary government action that either furthers no legitimate governmental interest or is so outrageous that it 'shocks the conscience.' [Citation omitted.]" *Chubb v. Sullivan*, 50 Kan. App. 2d 419, 437, 330 P.3d 423 (2014).

Because the previous panel determined there was a fundamental right in the patients' right to receive mail and their right to spend money, the district court did not directly address whether there was a fundamental constitutional right implicated by the vendor limitations policy. Rather, per its mandate, the district court went straight to determining if there was a legitimate government interest for the policy. We will not revisit the issue either but will simply examine whether the vendor limitations policy is constitutional because it advances a legitimate government interest.

The United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), established four considerations—known as the *Turner* factors—a court should use when weighing restrictions on a fundamental liberty against the government's interests necessitating the restrictions of an inmate's constitutional right. First, we must determine if the restriction is rationally related to a legitimate government interest. Second, if the restriction is so related, we then consider whether the government has left alternative means for the individual to exercise the restricted right. Third, our analysis must take into consideration the effect any accommodation of the right would have on guards, other inmates, and prison resources. Fourth, we are to consider if there

9

are less-restrictive alternatives that would serve the government's legitimate interest without infringing on the protected constitutional right. See *Turner*, 482 U.S. at 89-91; *Rice v. State*, 278 Kan. 309, 321, 95 P.3d 994 (2004) (citing *Turner* with approval). In the civil confinement context, a fifth factor is to be considered as the government's legitimate interests are narrower—the government's interest cannot be penological. *Chubb*, 50 Kan. App. 2d at 440-41. When examining each factor, we are to show deference to the professional judgment of the facility to determine the needs of the facility and the persons under its care. See *Turner*, 482 U.S. at 84-85 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.").

1.      *Is the three-vendor policy rationally related to a legitimate government interest?*

Our first step is to examine whether the vendor limitations policy is rationally related to a legitimate government interest. This court has previously held that there is a legitimate government interest in the treatment of sexually violent predators, and such treatment can be adversely affected by their possession of contraband. *Chubb*, 50 Kan. App. 2d at 442-43; see *Williams v. DesLauriers*, 38 Kan. App. 2d 629, 638, 172 P.3d 42 (2007). In so holding, the *Chubb* panel stated:

> "We do not believe any different standard applies to a secured facility housing dangerous mental patients. '[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' *Sandin*, 515 U.S. at 485; *Bell v. Wolfish*, 441 U.S. 520, 550, 555, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (upholding ban on inmate receipt of certain hardback books and packages containing personal property and food in order to counter risk of smuggled contraband). Federal courts around the country that have examined

10

similar policies—some more restrictive than the one here—have found them to be rationally related to a legitimate government interest of preventing contraband from entering the facility. See *Payne v. Friel*, No. 2:04-CV-844-DAK, 2007 WL 1100420, *8 (D. Utah 2007) (unpublished opinion) (the approved vendor policy not shown to prevent inmates from exercising protected rights), *reversed in part on other grounds by* 266 Fed. Appx. 724 (10th Cir. 2008); *Lindell v. Frank*, No. 02-C-21-C, 2003 WL 23198509, at *4-5 (W.D. Wis. 2003) (unpublished opinion) (could only purchase from limited number of outside vendors if item not available in facility canteen)." 50 Kan. App. 2d at 442-43.

The chief of safety and security, Tony Schwabauer, testified that the purpose of the vendor limitations policy was to "reduce the amount of prohibited items and contraband that comes into the [SPTP facility]." The superintendent of the facility echoed this testimony, stating that the purpose of the vendor limitations policy was to reduce the presence of contraband in the facility and, thereby, maintain a safe and secure environment. Schwabauer testified that prior to the vendor limitations policy, contraband was coming into the facility through the mail. He provided an example of how contraband can be introduced without a set list of vendors. Prior to the policy, in one instance a woman created a false shipping label to make the package appear as if it was coming from an outside business/vendor. One of the packages she shipped contained repackaged and falsely labeled contraband, such as cell phones and tobacco products. Other prohibited items—such as SD cards, cell phone chargers, and even an entire computer system hidden within a stereo—were introduced into the facility via the mail. Before the vendor limitations policy, the introduction of contraband was not difficult. Once contraband is introduced into the facility, it creates havoc with safety, leads to the solicitation of and trading for sexual favors between the patients, and is difficult to discover because it passes from one patient to another. Further, if contraband such as an SD card containing child pornography is introduced that contradicts a patient's therapy, not only is it illegal but also is extremely unhelpful for a sexually violent predator to advance through therapy from a clinical perspective.

11

Enactment of the vendor limitations policy, the use of a tomography machine—a type of x-ray machine—and mail inspection procedures have made it easier for the officers to stop contraband from entering the facility. The policy allows officers to identify suspected contraband, recognize the packaging used by approved vendors, and eliminate the likelihood that contraband will be introduced through the mail because it is very unlikely that approved vendors will hide contraband in packages ordered by the patients or their friends and family. Since the implementation of the policy, safety and security officers have come to recognize the label and packaging for each vendor and if "something looks off that will automatically . . . raise the flag to" inspect the package a little bit closer. This policy allows officers to identify what is a legitimate label versus what is not, and such a distinction allows the property officers to quickly identify a fraudulent package and prevent contraband from entering the facility.

Given this evidence, we find the vendor limitations policy is rationally related to the legitimate government interest in the safety, security, and treatment of the patients.

2.      *Are there alternative means for the patients to exercise the restricted right?*

The second *Turner* factor requires that we examine whether the government has left alternative means for the individual to exercise the restricted right.

Even though the vendor limitations policy limits the number of vendors available, the SPTP patients still have a choice of vendors that carry a wide range of products. The list of seven approved vendors includes Walmart and Walgreens, both of which sell a wide variety of products. Further, if one vendor does not carry a desired product, the patient may request approval to get the product from an unapproved vendor.

Here, the patients cite two instances when items they desired to purchase were more expensive through the approved vendor than the unapproved vendor. However, "the

mere fact that the facility's valid security concerns make it more expensive to obtain certain items is not sufficient to establish a constitutional violation." *Chubb*, 50 Kan. App. 2d at 443; see also *Myrie v. Commissioner, N.J. Dept. of Corrections*, 267 F.3d 251, 262 (3d Cir. 2001) (rejecting inmates' constitutional claims challenging 10 percent surcharge on purchases from jail commissaries in New Jersey); *French v. Butterworth*, 614 F.2d 23, 25 (1st Cir. 1980) ("We also reject French's contention that he and fellow inmates have a constitutionally protected interest in buying food as cheaply as possible."); *McCall v. Keefe Supply Co.*, 71 Fed. Appx. 779, 780 (10th Cir. 2003) (unpublished opinion) (holding prisoner has no constitutional right to purchase items as cheaply as possible); *Register v. Helder*, No. 15-5052, 2015 WL 6123071, at *2 (W.D. Ark. 2015) (unpublished opinion) ("Even if [prisoner] is charged exorbitant amounts, no constitutional claim is stated."); *Pagan v. Westchester County*, No. 12 Civ. 7669(PAE)(JCF), 2014 WL 982876, at *17 (S.D.N.Y. 2014) (unpublished opinion) (holding even if vender engages in price gouging, no constitutional claim is stated); *Montgomery v. Mancusco*, No. 12-2510, 2013 WL 4590436, at *3 (W.D. La. 2013) (unpublished opinion) ("The law is clear that inmates have no constitutionally protected interest in purchasing goods through the prison commissary at the cheapest price possible."); *McKnight v. Taylor*, No. 12-1684 (RMB), 2012 WL 5880331, at *6 (D.N.J. 2012) ("Prisoners have no federal constitutional right to purchase items from the jail commissary at any particular price, or to restrain the vendor from charging exorbitant prices."); *Boyd v. Nowack*, No. 09-7639, 2010 WL 892995, *4 (E.D. La. 2010) (unpublished opinion) ("[A] single commissary operating without competition does not run afoul of the Constitution."); *Ruhl v. Department of Corrections*, 35 N.E.3d 982, 987 (Ill. App. Ct. 2015) ("[P]laintiffs here have no constitutionally protected rights to commissary items at a specified price.").

One patient, David Benton, argues that the vendor limitations policy is too restrictive because it requires family members to order items from an approved vendor rather than mailing items and packages directly to the patients at the facility. Benton also

claims his mother does not have a credit card which she can use for purchases from the approved vendors. Logic and common sense dictate, however, that this inconvenience to his mother does not outweigh the need for the security, safety, and treatment of the patients. There are many other alternatives available. For example, Benton's mother could obtain a credit card, use another person's card with permission and then reimburse that person, or make purchases with a prepaid debit or gift card.

We find that vendor limitations policy leaves sufficient alternatives for patients.

3.     *What effect do any accommodations have on the facility?*

Third, we must assess the effect an accommodation of the right to receive mail or spend money would have on guards, other patients, and facility resources. As previously discussed, limiting the number of vendors allows better screening to prevent the potential introduction of contraband into the facility. Without the vendor limitations policy, contraband more easily entered the facility and created havoc for the safety and security of the patients and staff as well as the treatment of the patients. See *Lindell v. Frank*, No. 02-C-21-C, 2003 WL 23198509, at *5 (W.D. Wis. 2003) (unpublished opinion) (limited-vendor policy "reduces the need for staff to inspect a host of items mailed into the prison for contraband"). "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Clearly, the introduction of contraband has a significant ripple effect on patients and staff, and accommodations will likely cause significant issues in the facility.

4.     *Are there any less-restrictive alternatives that would serve the government's limited legitimate interest without infringing on the protected constitutional rights of the patients?*

14

Fourth, we must consider whether alternative restrictions are available which would serve the State's interest without infringing upon the patients' protected constitutional rights. The existence of such alternatives may be evidence that the policy was an "'exaggerated response'" to facility concerns. 482 U.S. at 90. However, "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." 482 U.S. at 90-91. "If the [patient] can point to an alternative that accommodates his or her constitutional rights with *de minimis* impact on the legitimate interests of the institution, then it may be an indication that the regulation does not satisfy the reasonable relationship standard." *Chubb*, 50 Kan. App. 2d at 444 (citing *Turner*, 482 U.S. at 91). It is difficult to envision any less restrictive means to achieve the government's interest, nor do the patients suggest one. The vendor limitations policy which only allows items to be sent from recognized and approved vendors assures staff that there is no possibility of tampering with the products that enter the facility and helps to protect the safety, security, and treatment of the patients, as well as the safety of the facility's employees.

5.      *Is the government interest here penological?*

Finally, because the vendor limitations policy occurs in a civil confinement context, the legitimate government interests are narrower. Thus, an additional consideration applies—the government interest cannot be penological. *Chubb*, 50 Kan. App. 2d at 440-41.

Here, the patients do not offer any evidence that the vendor limitations policy has a penological objective, other than testimony from some of the patients that they *felt* punished by the policy. There is no evidence in the record on appeal to suggest that the vendor limitations policy was adopted to punish the patients. Therefore, because the patients have failed to state a claim under K.S.A. 60-1501 sufficient to establish a

15

continuing violation of a constitutional stature, their claims regarding the vendor limitations policy must fail. The district court did not err in denying their petitions.

Affirmed.