(330 P.3d 423)
No. 110,221

MICHAEL R. CHUBB, *Appellant*, v. SHAWN SULLIVAN, Secretary of the KANSAS DEPARTMENT FOR AGING AND DISABILITY SERVICES, *et al.*, *Appellees*.

420

Opinion filed June 20, 2014.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Kimberly M.J. Lynch*, senior litigation counsel, and *Corrine E. Johnson*, litigation counsel, of Kansas Department for Aging and Disability Services, for appellees.

Before MALONE, C.J., HILL and ARNOLD-BURGER, JJ.

ARNOLD-BURGER, J.: Michael Chubb is an involuntary patient in the Kansas Sexual Predator Treatment Program at Larned State Hospital. On appeal he contends that the district court erred in summarily dismissing his petition filed under K.S.A. 60-1501. Chubb alleges four errors on appeal. First, he contends that his liberty interests were infringed when his brother was restricted from visiting Chubb at the facility. We find that Chubb has no liberty interest in a visit from his brother and even if he did his due process rights were not violated; thus, this claim fails.

Next, he asserts that his liberty interest in receiving mail was unconstitutionally restricted without due process when the hospital instituted a policy restricting purchases of consumable items to three vendors. But we find that the three-vendor policy does not implicate a constitutional right and even if it did the policy is reasonably related to a legitimate government purpose; thus, this claim also fails.

Third, Chubb argues that the grievance process was unacceptable and the inherent delays resulted in a systemic violation of due process. Because Chubb fails to allege or establish shocking and intolerable conduct or continuing mistreatment of a constitutional

stature, which is necessary to maintain a claim under K.S.A. 60-1501, his claim fails.

And finally, Chubb alleges that the affidavits submitted by the Kansas Department for Aging and Disability Services (KDADS) were invalid and were improperly considered by the district court. Because we find the affidavits meet all necessary requirements, we reject Chubb's claim.

Accordingly, the decision of the district court summarily dismissing Chubb's petition under K.S.A. 60-1501 is affirmed.

## FACTUAL AND PROCEDURAL HISTORY

Chubb, a patient within the Kansas Sexual Predator Treatment Program at Larned State Hospital, wanted to receive a visit from his brother. His brother filed the required visitation application with the hospital on June 14, 2011. In the application, it was indicated that the brother had been convicted of a "CSC 2nd" offense. When asked what "CSC 2nd" meant, Chubb indicated his brother had been convicted of criminal sexual conduct second degree. See Mich. Comp. Laws § 750.520c(2). On July 8, 2011, Chubb was informed that his brother's application was denied until his brother provided documentation that he completed some form of sexual offense treatment.

In addition, on September 13, 2011, a memo was posted within the facility informing the residents that they could, from that point forward, only purchase their consumable goods from three particular vendors, which meant that they could no longer receive consumable goods from family or other vendors. This was a blanket policy applicable to all patients.

Finally, at the time Chubb filed his K.S.A. 60-1501 petition, he had 15 grievance issues yet to be resolved within the hospital's grievance process. He claimed that they were 6 to 8 months old.

On October 7, 2011, Chubb filed a K.S.A. 60-1501 petition alleging (1) that his brother was denied access to the facility and was unable to visit Chubb, which denied Chubb his right under K.S.A. 2013 Supp. 59-29a22(b)(20) to visit his brother, without any due process; (2) that his right to receive items in the mail under K.S.A. 2013 Supp. 59-29a22(b)(15)(B)(iii), was restricted without due pro-

cess, which led to (3) the violation of his right to use his personal possessions for their intended purpose; and (4) that his right to petition for the redress of grievances against the government, which could occur under K.S.A. 2013 Supp. 59-29a22, had been violated.

The district court summarily dismissed Chubb's petition, finding that Chubb's claims did not establish that the KDADS acted with deliberate indifference or shocking conduct. In addition, his claims were not of a constitutional stature and were statutory in nature. As such, a K.S.A. 60-1501 petition was not the appropriate vehicle to assert Chubb's claims. Even if Chubb's claims did rise to a constitutional stature, the statute restricting visitation did not specifically limit the KDADS's discretion when restricting certain visitors, and Chubb received sufficient due process when he received notice that his brother would not be able to visit and had an opportunity to be heard through his individual therapist or the treatment team. With regard to the denial of Chubb's right to receive items in the mail, the district court found that his right was not denied, but merely restricted, and the restriction only related to whom he could receive mail from; it did not restrict the content of the mail. Moreover, the posted notice was sufficient for due process because the change in policy was a blanket change that applied to all patients. The district court found Chubb's grievance issue to be moot because nearly all of his grievances had been addressed during the litigation of his K.S.A. 60-1501 petition.

Chubb filed a timely notice of appeal.

## Standard of Review

Kansas appellate courts have long held that in order to state a claim for relief under K.S.A. 60-1501, a petition must allege "shocking and intolerable conduct or continuing mistreatment of a constitutional stature." *Johnson v. State*, 289 Kan. 642, 648, 215 P.3d 575 (2009); see also *Bankes v. Simmons*, 265 Kan. 341, 349, 963 P.2d 412, *cert. denied* 525 U.S. 1060 (1998). "A [K.S.A.] 60-1501 proceeding must include allegations of a constitutional dimension. If an inmate does not assert deprivation of a constitutional right, a district court should grant the State's request for

summary dismissal. [Citation omitted.]" *Ramirez v. State*, 23 Kan. App. 2d 445, 448, 931 P.2d 1265, *rev. denied* 262 Kan. 962 (1997); see also *Anderson v. McKune*, 23 Kan. App. 2d 803, 806-07, 937 P.2d 16 ("An inmate's claim under K.S.A. 60-1501 must assert the deprivation of a constitutional right or the court is without jurisdiction to consider the claim. In the absence of such a claim, the petition should be summarily dismissed. [Citation omitted.]"), *rev. denied* 262 Kan. 959, *cert. denied* 522 U.S. 958 (1997). An appellate court exercises unlimited review of a summary dismissal. *Johnson*, 289 Kan. at 649.

On review, our task is to accept as true the allegations in Chubb's petition in order to determine if the facts alleged and their reasonable inferences state a claim for relief. See *Schuyler v. Roberts*, 285 Kan. 677, 679, 175 P.3d 259 (2008). Chubb bears the burden of alleging continuing mistreatment of a constitutional nature to avoid dismissal. See *Anderson*, 23 Kan. App. 2d at 807.

## CONDITIONS OF CONFINEMENT OF SEXUALLY VIOLENT PREDATORS, IN GENERAL

The statutory provisions regarding the involuntary commitment of sexually violent predators are found at K.S.A. 59-29a01 *et seq.* In order to be civilly confined, there must be a finding, beyond a reasonable doubt, that the person is a sexually violent predator. K.S.A. 2013 Supp. 59-29a07. This means that the person suffers from a mental abnormality or personality disorder that predisposes the person to likely commit repeated sexually violent acts, making the person a menace to the health and safety of others. K.S.A. 2013 Supp. 59-29a02. Although a finding of dangerousness alone is generally not enough to justify indefinite involuntary commitment, when it is coupled with an additional factor, such as mental illness or mental abnormality, such a commitment is permitted. *Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997). Moreover, there must be some proof that the committed person has serious difficulty controlling his or her dangerous behavior. *Kansas v. Crane*, 534 U.S. 407, 408, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002).

"Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22, 324, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). But because of their dangerousness and the need to protect society, sexually violent predators are different in terms of treatment and risk and may be subjected to different confinement conditions than other civilly committed individuals. See *Merryfield v. State*, 44 Kan. App. 2d 817, 823-24, 241 P.3d 573 (2010). And although courts have recognized that civilly committed sexually violent predators are entitled to fewer restrictions than convicted criminals serving a prison term, due to their dangerous character and propensity to re-offend, they have generally equated the conditions of their confinement with that of pretrial detention, rather than the less structured confinement of regular mental patients. But they may not be subjected to conditions that amount to "punishment" without due process. *Youngberg*, 457 U.S. at 320-21.

So it follows logically that the rights afforded prisoners set a floor for the rights that must be afforded sexually violent predators. It is not always clear how much more expansive the rights of civilly committed dangerous persons are from those that are criminally detained. But a secure facility, whether it houses prisoners or dangerous civilly committed patients, has a legitimate interest in "maintaining institutional security and preserving internal order and discipline," which "may require limitation or retraction" of the residents' retained constitutional rights. *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); see also *Salerno v. Corzine*, No. 06-3547, 2013 WL 5505741, at *6 (D.N.J. 2013) (unpublished opinion) ("While courts of appeals have been reluctant to articulate a specific standard applicable to civilly committed individuals, they· have found that restrictions are permissible so long as they advance the state's interest in security, order, and rehabilitation."). With this background in mind, we examine the constitutional deprivations alleged by Chubb.

### CHUBB'S LIBERTY INTEREST IN A VISIT FROM HIS BROTHER

In 2007, the Kansas Legislature adopted provisions granting residents of the Sexual Predator Treatment Program certain statutory rights. These are contained at K.S.A. 2013 Supp. 59-29a22. At issue here is K.S.A. 2013 Supp. 59-29a22(b)(20) which provides that each patient shall "[b]e permitted to see a reasonable number of visitors who do not pose a threat to the security or therapeutic climate of other patients or the facility." This right, along with six others listed in K.S.A. 2013 Supp. 59-29a22(c),

"may be denied for cause after review by the superintendent of the facility or the superintendent's designee, and may be denied when medically or therapeutically contraindicated as documented by the patient's physician or licensed psychologist in the patient's treatment record. The individual shall be informed in writing of the grounds for withdrawal of the right and shall have the opportunity for a review of the withdrawal of the right in an informal hearing before the superintendent of the facility or the superintendent's designee. There shall be documentation of the grounds for withdrawal of rights in the patient's treatment record. After an informal hearing is held, a patient or such patient's representative may petition for review of the denial of any right . . . through the use of the grievance procedure."

Chubb argues that this statutory right was violated when his brother was not permitted to visit him without first showing proof that he had completed a sex offense treatment program. He identifies the constitutional right at issue as a liberty interest in receiving visitors. In his petition he claimed that his constitutional due process rights were violated because "he has not received any notice, hearing, or any form of Due Process for the restriction of this right." And finally, he contends, for the first time on appeal, that the visitation statute is void for vagueness because it does not identify what constitutes a "threat to the facility or to the therapeutic climate of others." We will take each argument in turn.

*Chubb does not have an independent liberty interest in receiving visitors.*

A proceeding under K.S.A. 60-1501 must allege "shocking and intolerable conduct or continuing mistreatment of a constitutional stature." *Johnson,* 289 Kan. at 648. Chubb does not contend that any action by the KDADS amounts to shocking or intolerable con-

duct. Instead he rests his claims on the deprivation of a constitutional right. Chubb first identifies the constitutional right at issue here as a liberty interest. Personal or individual liberty is generally defined as "[o]ne's freedom to do as one pleases, limited only by the government's right to regulate the public health, safety, and welfare." Black's Law Dictionary 1002 (9th ed. 2009). We note that protected liberty interests arise from two sources: (1) the Due Process Clause of the Fourteenth Amendment to the United States Constitution ("No State shall . . . deprive any person of life, liberty, or property without due process of law.") and (2) the laws of the states. *Williams v. DesLauriers*, 38 Kan. App. 2d 629, 636-37, 172 P.3d 42 (2007).

Chubb argues that the liberty interest in receiving visitors derives from K.S.A. 2013 Supp. 59-29a22(b)(20) (that each patient shall "[b]e permitted to see a reasonable number of visitors who do not pose a threat to the security or therapeutic climate of other patients or the facility"). So we next examine whether this statute creates a liberty interest, by turning to a very similar United States Supreme Court case.

In *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 458, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989), the United States Supreme Court was examining a prison regulation, very similar to the statute at issue here, that allowed the institution to prohibit persons from visiting inmates that were a threat to security or were nonconducive to a prisoner's successful re-entry into the community or were detrimental to the inmate's rehabilitation. After noting that certain State-created liberty interests have been found to be entitled to due process protection, while others have not, the Court noted that this was not because of a finding that some interests were more significant than others, but instead it was based upon the language of the relevant statutes and regulations. 490 U.S. at 461. The Court found that the State may create a liberty interest in a number of ways.

"Neither the drafting of regulations nor their interpretation can be reduced to an exact science. Our past decisions suggest, however, that the most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decision-making, [citations omitted] and, further, by mandating

the outcome to be reached upon a finding that the relevant criteria have been met." 490 U.S. at 462.

When examining the regulation at issue, the Court found that it allowed certain staff discretion in deciding whether a visitor should be allowed admittance. 490 U.S. at 464.

"Visitors *may* be excluded if they fall within one of the described categories . . . but they need not be. Nor need visitors fall within one of the described categories in order to be excluded. The overall effect of the regulations is not such that an inmate can reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions. Or, to state it differently, the regulations are not worded in such a way that an inmate could reasonably expect to enforce them against the prison officials." 490 U.S. at 464-65.

The Supreme Court concluded that the visitation regulation did not establish a liberty interest. 490 U.S. at 465.

Subsequent to *Thompson*, the United States Supreme Court again addressed the issue of the manner in which a statute or regulation may create a liberty interest in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995). The Court questioned the mandatory versus discretionary statutory analysis that had developed over the years and noted that this focus has produced undesirable results. See 515 U.S. at 499 (Breyer, J., dissenting) (describing this as the "discretion-cabining approach"). First, it creates a "disincentive for States to codify prison management procedures in the interest of uniform treatment." 515 U.S. at 482. When faced with a difficult and dangerous environment, prison administrators often find it necessary to adopt mandatory and uniform procedures to guide staff and prevent widely disparate treatment. By requiring these regulations to allow discretion to avoid a finding of a liberty interest, these facilities are forced to either have "scarcely any regulations" or to confer "standardless discretion on correctional personnel." 515 U.S. at 482.

Second, it has led to the involvement of the courts in the day-to-day management of the prisons, instead of affording "appropriate deference and flexibility to state officials trying to manage a volatile environment." 515 U.S. at 482. The Court noted that since the mandatory versus discretionary analysis was first outlined in

*Hewitt v. Helms*, 459 U.S. 460, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983), federal courts have been inundated with claims of liberty interests in treatment that seems to be part of the ordinary incidents of prison life such as the right to participate in boot camp programs, the travel limit on furloughs, the right to receive a tray lunch rather than a sack lunch, the right to receive a paperback dictionary because it does not present a threat to the order and security of the prison, the freedom from transfer to a smaller cell without electrical outlets for televisions, the right to a prison job, and a liberty interest in not being placed on a food loaf diet. *Sandin*, 515 U.S. at 483. Faced with this frustration at the "squandering [of] judicial resources with little offsetting benefit to anyone," the Supreme Court found that it was time to return to basic due process principles. 515 U.S. at 482. Although states may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, "these interests will be generally limited to freedom from restraint" which imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484.

Of import here is the fact that even though the *Sandin* decision "abandons an approach that in practice is difficult to administer and which produces anomalous results," the Court specifically did not overrule the *Thompson* Court's conclusion that there was no liberty interest implicated in the State's visitation policy. 515 U.S. at 484 n.5. After *Sandin,* the Tenth Circuit Court of Appeals has "repeatedly and consistently disavowed a liberty interest in visitation." *Dennis v. Tate*, No. Civ-11-1303-D, 2012 WL 5289421 (W.D. Okla. 2012) (unpublished opinion) (citing *Marshall v. Morton*, 421 Fed. Appx. 832, 838 [10th Cir. 2011] [stating that restrictions on a prisoner's visitation " 'are not different in such degree and duration as compared with the ordinary incidents of prisoner life to constitute protected liberty interests under the Due Process Clause' "], *cert. denied* 132 S. Ct. 1020 [2012]).

Our court first examined *Sandin* just a few months after its release in *Davis v. Finney*, 21 Kan. App. 2d 547, 556, 902 P.2d 498 (1995). The panel examined *Hewitt* and *Thompson* and the discretion-cabining approach taken in those cases as well as the change

in approach taken in *Sandin*. The *Davis* court adopted both the discretion-cabining approach and, in the alternative, the atypical-hardship approach. 21 Kan. App. 2d at 558-59. The Kansas Supreme Court adopted this dual approach in determining the existence of a liberty interest in *Amos v. Nelson*, 260 Kan. 652, 923 P.2d 1014 (1996). The court clarified that this is a two-part test, finding that the discretion-cabining approach serves as the threshold test. So only if the statutory language is mandatory, does the court even examine whether the statute imposes an atypical and significant hardship on the inmate. 260 Kan. at 666.

The statute applied here, like *Thompson*, contains discretionary, not mandatory language. It provides that the Sexual Predator Treatment Program *may* exclude visitors if they pose a threat to the security or therapeutic climate of other patients or the facility. Moreover, the regulation adopted to "ensure the resident's rights to receive or refuse visitors," SECURE-118, states that the Sexual Predator Treatment Program *"may* restrict former residents or known felons from visiting. A resident may petition his treatment team for waiver of this rule." (Emphasis added.) See K.S.A. 2013 Supp. 59-29a22(d) (The agency "shall establish procedures to assure protection of patients' rights guaranteed under this section.").

So under the *Amos* standard, because the visitation statute allows significant discretion on the part of program staff, we need not even consider whether the statute imposes an atypical and significant hardship on the resident. But even if we were to examine the Sexual Predator Treatment Program's visitation policy under the lens of *Sandin* and the second step in *Amos*, we do not believe that limiting visitation by convicted felons, particularly those who have committed sexual offenses, absent a waiver by staff, imposes atypical and significant hardship on the residents in relation to the ordinary incidents of life in a confined and dangerous environment such as the Sexual Predator Treatment Program. See also *Billups v. Galassi*, No. 99-1460, 2000 WL 6200 (7th Cir. 2000) (unpublished opinion) (denial of right to visit with a specific visitor is not an atypical and significant hardship); *Robinson v. State*, 198 Kan. 543, 546, 426 P.2d 95 (1967) (sheriff's rule restricting visits to cer-

tain weekdays and limiting visitors not an infringement upon any constitutional right).

According to affidavits presented by KDADS, visitation requests are processed through the resident's primary therapist who examines whether the visitor has any prior convictions, particularly sex offenses. If the visitor has a prior sex offense, it is viewed to be detrimental to the resident's therapy if the visitor has not also completed sex offense treatment. Otherwise, the visits may be counter-therapeutic. Two more levels of review are accomplished, first to the resident's Treatment Team and then to the Clinical Team (also called Leadership Team), made up of clinicians, administrative staff, and unit leaders, before a final recommendation from the Clinical Team is made. The visit may be approved, denied, or denied pending receipt of further information. In Chubb's case, because his brother has a conviction for a sex offense, his visit was denied pending receipt of further information—proof of sex offense treatment. No proof was ever submitted. Chubb was advised that he could resubmit a request for his brother's visitation at any time he had such proof. Chubb was not absolutely denied visitation with his brother, a convicted sex offender, it was merely made contingent upon proof that his brother had completed sex offender treatment, a restriction placed by his treatment staff in an effort to protect the security needs and therapeutic climate of both Chubb and other patients in the facility. We do not view this as a significant hardship.

*Chubb's right to procedural due process was not denied.*

The Due Process Clause itself, rather than a state statute or regulation, can be the "wellspring" of a protected liberty interest. *Sandin*, 515 U.S. at 489 (Ginsburg, J., dissenting); see *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005) ("liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty' ").

Although Chubb does not specifically state whether he is alleging a violation of substantive due process or procedural due process, his identification of the essential elements as notice and an opportunity to be heard inform us that his claim is one of the denial of

his right to procedural due process. See *State v. Becker*, 36 Kan. App. 2d 828, 836, 145 P.3d 938 (2006) ("Notice is a procedural right rather than a substantive right."), *rev. denied* 283 Kan. 932 (2007).

The first determination a court must make when reviewing a procedural due process claim is whether a protected liberty or property interest is involved. It is only when a court finds a protected interest is implicated that it must then determine the nature and extent of the process that is due. *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409, 49 P.3d 1274 (2002). The United States Supreme Court has recognized the difficulty in defining a liberty interest under the Fourteenth Amendment Due Process Clause "with exactness." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923).

"[Liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. [Citations omitted.]" 262 U.S. at 399.

But specifically, with regards to the right of a person confined in a secure facility to visitation, the United States Supreme Court has opined that it "[cannot] seriously be contended, in light of our prior cases—that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Thompson*, 490 U.S. at 460. Accordingly, the right to unfettered visitation does not spring directly from the Due Process Clause. As Justice Kennedy pointed out in his concurring opinion in *Thompson*, a ban on all visitation certainly may implicate the protections of the Due Process Clause. 490 U.S. at 465. But there is a recognition in *Thompson* that restrictions may be placed on visitation without implicating a liberty interest and its attendant due process requirements. What we have here is a restriction virtually identical to the one at issue in *Thompson*. As such, we reach the same conclusion as the United States Supreme Court and find that a liberty interest is not implicated under the facts at issue here.

Even if we examine other constitutional rights that could be implicated, such as the First Amendment right to association, the United States Supreme Court has found that it is one of the rights least compatible with secured detention. "[N]umerous associational rights are necessarily curtailed by the realities of confinement." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 132, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977). In addition, Chubb's right of association with his brother was not completely denied. He was still allowed to speak to him by phone and mail. See *Overton v. Bazzetta*, 539 U.S. 126, 135, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003) ("Alternatives to visitation need not be ideal, however; they need only be available."). The denial of visitation, which may have only been temporary, was not for a penological or punitive interest, but a security and therapeutic one. Accordingly, we can conceive of no constitutional right violated by the hospital's decision to deny Chubb's brother the right to visit until such time as he presented proof of sex offense treatment.

But even if we were to find a protected liberty interest at stake, the heart of a procedural due process claim are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Village Villa v. Kansas Health Policy Authority*, 296 Kan. 315, 331, 291 P.3d 1056 (2013). The KDADS informed Chubb that his brother's visitation application had been denied and that if documentation could be provided showing that the brother had received sex offender treatment, then the application would be reconsidered. This was all accomplished before the date of the proposed visit.

The program's clinical staff has the right to restrict a patient's visitors. Chubb does not challenge the authority of the program staff under SECURE-118. Instead he argues specifically that there was no evidence in this particular case that his brother posed any kind of threat, therefore, staff acted in an arbitrary and capricious manner.

But with regard to procedural due process, that being notice and a meaningful opportunity to be heard, Chubb was given the opportunity to speak with his therapist about the denial of his brother's visitor application. In addition, K.S.A. 2013 Supp. 59-

29a22(c) provides that if the resident is not satisfied with this informal resolution, he or she may petition for review of the denial of any right denied to him or her through use of the grievance procedure. There *is no indication in the record that Chubb ever availed himself of this option.* Therefore, even if Chubb had a right under the Due Process Clause to visitation, any procedural due process rights that Chubb had were not violated. It does not appear from the record that Chubb filed a grievance over the denial of his brother's visitation. This is significant because a petitioner must have exhausted available administrative remedies before seeking judicial review under a K.S.A. 60-1501 proceeding. *Fletcher v. Nelson,* 253 Kan. 389, Syl. ¶ 3, 855 P.2d 940 (1993).

In sum, Chubb's claim is solely statutory. Because Chubb has no liberty interest in a visit from his brother and any procedural due process rights he had were not violated, we agree with the district court that his K.S.A. 60-1501 petition does not state a claim sufficient to establish a continuing violation of a constitutional stature and his claim fails.

## Void for Vagueness

Chubb also contends that K.S.A. 2013 Supp. 59-29a22(b)(20) is unconstitutional because it is vague. Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *Miller v. Bartle,* 283 Kan. 108, 119, 150 P.3d 1282 (2007). There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following:

" '(1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision.' " *In re Estate of Broderick,* 286 Kan. 1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 1178 (2009).

Chubb clearly did not raise this issue in the district court. But he argues, summarily, that at least two of the listed exceptions apply here. He contends that it is "an issue of constitutional stature,

where the issue is finally determinative of the issue," and "the question is necessary to serve the ends of justice or to prevent the denial of a fundamental right." He argues, without support, that his constitutional right to due process will continue to be violated by the enforcement of a vague statute.

But we have already determined that Chubb has not been denied a fundamental right by the denial of his brother's visitation application and this is not an issue of constitutional stature. In addition, resolution of this matter will not be finally determinative. The patients' bill of rights contained at K.S.A. 2013 Supp. 59-29a22, grants statutory rights to a resident, rather than taking rights away. See *Merryfield v. Kansas Dept. of SRS*, No. 104,004, 2010 WL 5490755, at *4 (Kan. App. 2010) (unpublished opinion) (K.S.A. 2009 Supp. 59-29a22[b][16] gives phone access rights to patients, it does not take them away, defeating the bases for a void-for-vagueness claim), *rev. denied* 291 Kan. 913 (2011). Even if this court found K.S.A. 2013 Supp. 59-29a22(b)(20) to be unconstitutionally vague, it would eliminate this statutory right and any argument that the statute itself grants a liberty interest, but it would not fully resolve the issue of whether the denial of visitation in Chubb's situation violated a liberty interest that springs directly from the Due Process Clause of the Fourteenth Amendment. Accordingly, we will not address this issue for the first time on appeal.

## CHUBB'S CONSTITUTIONAL RIGHTS RELATING TO THE THREE-VENDOR LIMITATION FOR THE PURCHASE OF CONSUMABLE ITEMS

On September 13, 2011, a memo was posted within the facility informing the residents that they could, from that point forward, only purchase their consumable goods from three particular vendors, which meant that they could no longer receive consumable goods from family or other vendors. A reason for this policy change was not apparent within the memo.

Chubb contends that the district court erred when it summarily dismissed his claim. He argues that his right to receive items in the mail was violated by the KDADS when it adopted this policy. Chubb asserts that this policy implicated his liberty interest and

accordingly his due process rights were violated when the KDADS made the decision to reduce the number of possible vendors without giving him an opportunity to be heard.

K.S.A. 2013 Supp. 59-29a22(b)(15) provides that residents have the right to send and receive items in the mail. "Residents may be restricted in receiving in the mail items deemed pornographic, offensive or which is deemed to jeopardize their individual treatment or that of others." K.S.A. 2013 Supp. 59-29a22(b)(15)(B)(iii). This statute, like the right to receive visitors, is subject to the provision in K.S.A. 2013 Supp. 59-29a22(c) that allows this right to be individually denied for "cause" after review by the superintendent of the facility or the superintendent's designee. Once the right is denied, the individual must be informed in writing of the grounds for withdrawal of the right and shall have the opportunity for a review of the withdrawal of the right before the superintendent of the facility or the superintendent's designee. Accordingly, the right to send and receive mail is specific to the patient.

Chubb argues that the new three-vendor policy denies him his statutory right to receive sealed mail that does not otherwise violate the policy. But Chubb does not allege an individual denial of this right. In other words, he does not claim that there is an approved item that he wishes to purchase that he cannot receive from one of the three approved vendors. Likewise, with regards to his right to spend money as he wishes under K.S.A. 2013 Supp. 59-29a22(a)(22), he does not allege that approved items from the vendors are more expensive than he could purchase elsewhere. Accordingly, he has neither alleged nor pursued an internal grievance for the denial of his right to receive mail. Instead, he contends that the newly adopted policy in general violates his due process rights. He claims that correspondence between an inmate and an outsider implicates his First Amendment right to freedom of speech and its denial absent any legitimate governmental interest is shocking and intolerable conduct or continuing mistreatment of a constitutional nature. We view this as a substantive due process claim.

Substantive due process claims involve a narrow range of fundamental interests such as the right to bear children, the right to marry, and other rights closely tied to the Bill of Rights in the

United States Constitution. See *Taylor v. Kansas Dept. of Health and Environment*, 49 Kan. App. 2d 233, 244-45, 305 P.3d 729 (2013). Substantive due process protects an individual from arbitrary government action that either furthers no legitimate governmental interest or is so outrageous that it " 'shocks the conscience.' " 49 Kan. App. 2d at 244. This seems to be what Chubb is alleging as it relates to the three-vendor policy. So first, we must determine whether there is a fundamental constitutional right at stake here.

*There is no fundamental constitutional right implicated by the three-vendor policy.*

Chubb cites *Collier v. Nelson*, 25 Kan. App. 2d 582, 966 P.2d 1117, *rev. denied* 266 Kan. 1107 (1998), for the proposition that correspondence between an inmate and an outsider implicates the right to freedom of speech under the First Amendment and a qualified liberty interest that is protected from governmental suppression. Our Supreme Court, as well as the United States Supreme Court, has designated freedom of speech as a fundamental constitutional right. See *Thornhill v. Alabama*, 310 U.S. 88, 95, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); *State v. Russell*, 227 Kan. 897, 900, 610 P.2d 1122 (1980). But an examination of the *Collier* decision reveals that it does not support Chubb's claim in the context of receiving consumable goods from multiple vendors.

*Collier* involved a prisoner's right to send mail by limiting the number of first class stamps a prisoner could possess. Citing United States Supreme Court precedent, the court found that correspondence between an inmate and an outsider necessarily implicated freedom of speech guaranteed under the First Amendment. 25 Kan. App. 2d at 585 (citing *Procunier v. Martinez*, 416 U.S. 396, 408-09, 94 S. Ct. 1800, 40 L. Ed. 2d 224 [1974], *overruled in part by Thornburgh v. Abbott*, 490 U.S. 401, 413-14, 109 S. Ct. 1874, 104 L. Ed. 2d 459 [1989]). The Supreme Court in *Thornburgh* recognized that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." 490 U.S. at 413; see also *Treff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996) (same). We fail to see how the prison policy limiting the number of vendors impli-

cates the First Amendment. It has no application to a patient's freedom of speech.

Although Chubb does not claim a general liberty interest with regards to the three-vendor policy (only a qualified fundamental liberty interest based on the First Amendment), if he did, it too would fail. Again, even if he were able to establish a liberty interest was created by the adoption of K.S.A. 2013 Supp. 59-29a22(b)(15) and (22) (the statutory right to receive mail and the statutory right to spend money), he is unable to establish the second prong of the analysis, that the restriction in the number of vendors imposes an atypical and significant hardship on residents in relation to the ordinary incidents of life in a confined and dangerous environment such as the Sexual Predator Treatment Program. See *Amos*, 260 Kan. at 666. We find that it does not. As we discuss later in this opinion, patients have been given a wide range of purchasing options while still giving deference to the hospital's need to prevent contraband from entering the facility that would be detrimental to both the safety and the therapeutic needs of the patients.

Instead of a qualified liberty interest, as alleged by Chubb, we realize that this court has recognized in the past that K.S.A. 2013 Supp. 59-29a22(b)(15) establishes a patient's *property* interest in receiving mail. See *Merryfield v. Kansas Dept. of SRS*, No. 102,384, 2009 WL 5206252 (Kan. App. 2009) (unpublished opinion). The statute requires that a patient be allowed to send and receive sealed mail subject to certain limitations and supports that right by providing a process to review any alleged denial of the right for "cause." K.S.A. 2013 Supp. 59-29a22(b)(20) and (c). Likewise, a panel of this court has found that the same three-vendor policy at issue here implicates the patient's property right to spend his or her money under K.S.A. 2013 Supp. 59-29a22(b)(22). See *Pew v. Sullivan*, 50 Kan. App. 2d 106, 329 P.3d 496 (2014).

A property right is defined as "the right to specific property, whether tangible or intangible." Black's Law Dictionary 1437 (9th ed. 2009). Property is further defined as "[t]he right to possess, use, and enjoy a determinate thing; . . . the right of ownership." Black's Law Dictionary 1335 (9th ed. 2009). Moreover, under the Due Process Clause of the Fourteenth Amendment "[a] protected

property right must have some ascertainable monetary value." *Landmark Nat'l Bank v. Kesler*, 289 Kan. 528, 545, 216 P.3d 158 (2009). We fail to see any monetary value in either the right to receive mail or the right to spend one's money. Chubb makes no allegation that he could obtain the same items cheaper from another source. In order to constitute a protected liberty or property interest for Fourteenth Amendment purposes, an individual must have a legitimate claim of entitlement to it. The interest must be more than an abstract need or desire and more than a unilateral expectation. *Murphy v. Nelson*, 260 Kan. 589, 598, 921 P.2d 1225 (1996).

Moreover, neither of these statutory provisions implicates a fundamental constitutional right sufficient to demonstrate a substantive due process claim regarding the three-vendor policy. Of the few courts that have addressed this issue, none have found *any* constitutional right at stake, let alone a fundamental one. *Torres v. Cate*, No. C 12-6236 LHK (PR), 2013 WL 1097997, at *2 (N.D. Cal. 2013) (unpublished opinion) ("The Due Process Clause protects persons against deprivations of life, liberty, and property without due process of law. It does not guarantee prisoners a right to purchase property from outside vendors, or to purchase property at all."); *Ciempa v. Jones*,745 F. Supp. 2d 1171, 1199 (N.D. Okla. 2010) ("Incarceration necessarily carries with it restrictions on a prisoner's ability to purchase items of his or her choosing."); *Davis v. Powers*, No. C08-5751, 2010 WL 2163134, at *9 (W.D. Wash. 2010) (unpublished opinion) (institutional requirement of sexually violent predators to buy or receive property from only approved vendors does not rise to level of constitutional significance); *Stringham v. Hubbard*, No. CIV S-05-0898 GEB DAD P., 2006 WL 3053079, at *4 (E.D. Cal. 2006) (unpublished opinion) ("Although protected property interests may arise from state law, plaintiff has cited no California law that gives him a protected interest in making purchases from multitudes of vendors.").

Likewise, we do not view the policy in question as denying Chubb any constitutional right, and certainly not a fundamental one. He may spend his money as he chooses, and he may receive things through the mail.

Accordingly, we find that Chubb's substantive due process rights are not implicated by the three-vendor policy.

*The three-vendor policy advances a legitimate government interest.*

But even if we were to find a fundamental constitutional right at stake, we must next examine whether the regulation advances a legitimate government interest or is arbitrary.

In determining whether government action in restricting an inmate's constitutional right is justified or arbitrary, the United States Supreme Court, in *Turner v. Safley*, 482 U.S. 78, 89-91, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), established four considerations a court should use when weighing restrictions on a fundamental liberty against the government interests necessitating the restrictions. See *Rice v. State*, 278 Kan. 309, 321, 95 P.3d 994 (2004) (citing *Turner* with approval). First, the court must determine whether a restriction is rationally related to a legitimate government interest. If so, the court must then consider whether the government has left alternative means for the individual to exercise the restricted right. Third, the court should consider what effect an accommodation of the right would have on guards, other inmates, and prison resources. Finally, the court should consider whether alternative restrictions are available that would serve the government's interest without impinging upon the protected constitutional right. *Turner*, 482 U.S. at 89-91.

A modified application of the *Turner* factors has been used in the civil confinement context, recognizing that the legitimate government interests are narrower than in the prison context, *i.e.*, the government interest cannot be penological. See, *e.g.*, *Pesci v. Budz*, 730 F.3d 1291, 1296-97 (11th Cir. 2013) (applying modified four-part *Turner* test to claim of unreasonable censorship of newsletter within the sexually violent predator unit); *Rivera v. Rogers*, 224 Fed. Appx. 148, 151 (3d Cir. 2007) (applying *Turner* test to analyze claim by civilly committed individuals alleging violation of First Amendment right by mail-opening practice at hospital); *Salerno v. Corzine*, No. 06-3547, 2013 WL 5505741, at *7-9 (D.N.J. 2013) (unpublished opinion) (discussing *Turner* test in light of First Amendment claim related to treatment requirement that patients

discuss previous sexual misconduct); *Marsh v. Liberty Behavioral Health Care, Inc.*, No. 2:06-CV-125-FtM-34SPC, 2008 WL 821623, at *5 (M.D. Fla. 2008) (unpublished opinion) (applying *Turner* test to claim of violation of right to free exercise of religion), *aff'd* 330 Fed. Appx. 179 (11th Cir. 2009); *Beaulieu v. Ludeman*, No. 07-CV-1535, 2008 WL 2498241, at *20 (D. Minn. 2008) (unpublished opinion) (applying *Turner* to analyze restrictions on sexually violent predator telephone privileges); *Ivey v. Mooney*, 2008 WL 4527792, at *4-5 n.7 (D. Minn. 2008) (using *Turner* test despite alleged violation of statute, not specifically stated violation of constitutional right); *Francis v. Watson*, No. 3:05-2499-JFA-JRM, 2006 WL 2716452, at *3 (D.S.C. 2006) (unpublished opinion) (right to free exercise of religion); *Willis v. Smith*, No. C04-4012-MWB, 2005 WL 550528, at *14 (N.D. Iowa 2005) (unpublished opinion) (applying *Turner* to mail room procedures in a civil commitment facility).

In adopting the four-part test, the United States Supreme Court in *Turner* specifically acknowledged the deference the courts should extend to the professional judgment of the executive branch to determine the needs of the facility and the persons under its care. See 482 U.S. at 84-85 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint."); *Rice*, 278 Kan. at 322. Nevertheless, the Court noted that the four-part test it adopted adequately preserved this deference to professional judgment while providing a safeguard against arbitrary restrictions on fundamental liberties. Accordingly, the *Turner* test provides a suitable basis for this court's review of Chubb's complaints about the three-vendor restriction.

We first examine whether the three-vendor restriction is rationally related to a legitimate government interest. We find that it is. Unlike in *Pew*—where the panel noted that the KDADS had presented no reason for the policy, in this case the KDADS presented

an affidavit setting forth the reasons for the policy. See 50 Kan. App. 2d at 111-12. Clifford Voelker, the Administrative Program Director of the Sexual Predator Treatment Program, noted that before the policy was adopted the program had a significant problem with contraband being sent to residents through the mail. Items sent from friends or family would contain contraband, such as tobacco products and cell phones, hidden within approved items to bypass security. Cell phones "are used by residents to access the internet to access pornography sites or to contact minors or previous victims." In addition, tobacco and other contraband items were being trafficked within the facility and were either being sold at an increased cost to other residents or later used for extortion. By limiting the vendors to an approved list, the ability of the program to effectively monitor the entry of restricted items into the facility is increased because the items are from a recognized vendor and, accordingly, not tampered with in advance. Chubb does not contest the stated reason for the policy. He merely challenges whether the KDADS rationale states a legitimate government interest.

This court has recognized that the State has a compelling interest in the treatment of sexually violent predators, which treatment can be adversely affected by their possession of prohibited materials. *Williams v. DesLauriers*, 38 Kan. App. 2d 629, 633, 638, 172 P.3d 42 (2007); see *Steffey v. Orman*, 461 F.3d 1218, 1222-23 (10th Cir. 2006) ("[I]t is well-established that prisons have broad discretion in regulating the entry of materials into prison."). We do not believe any different standard applies to a secured facility housing dangerous mental patients. " ' "[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." ' " *Sandin*, 515 U.S. at 485; *Bell v. Wolfish*, 441 U.S. 520, 550, 555, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (upholding ban on inmate receipt of certain hardback books and packages containing personal property and food in order to counter risk of smuggled contraband). Federal courts around the country that have examined similar policies—some more restrictive than the one here—have found them to be rationally related to a legitimate

government interest of preventing contraband from entering the facility. See *Payne v. Friel*, No. 2:04-CV-844-DAK, 2007 WL 1100420, *8 (D. Utah 2007) (unpublished opinion) (the approved vendor policy not shown to prevent inmates from exercising protected rights), *reversed in part on other grounds by* 266 Fed. Appx. 724 (10th Cir. 2008); *Lindell v. Frank*, No. 02-C-21-C, 2003 WL 23198509, at *4 -5 (W.D. Wis. 2003) (unpublished opinion) (could only purchase from limited number of outside vendors if item not available in facility canteen).

The second *Turner* factor is whether the government has left alternative means for the individual to exercise the restricted right. In this case, if we are assuming for the purposes of this argument that the right at stake is a property right to receive mail and spend money as found in *Pew* and *Merryfield*, the policy gives residents a choice of vendors that carry a wide range of products. The list of three approved vendors, Keefe, Walkenhorst, and J.L. Marcus, was later expanded to remove J.L. Marcus (due to complaints by residents that it was difficult to work with) and Wal-Mart and Walgreens were added to the approved list. It cannot be argued that Wal-Mart and Walgreens do not sell a wide variety of products. Again, Chubb makes no allegation that he could obtain the same items cheaper from another source, but even if he did, the mere fact that the facility's valid security concerns make it more expensive to obtain certain items is not sufficient to establish a constitutional violation. See *Payne*, 2007 WL 1100420, at *8.

Next, the third *Turner* factor is the effect an accommodation of the right would have on guards, other inmates, and prison resources. Program Director Voelker indicated in his affidavit that restricting the number of vendors allows the safety-security staff and the property staff to better track the items. Absent the policy, hidden items are able to bypass security. See *Lindell*, 2003 WL 23198509, at *5 (Restricted vendor policy "reduces the need for staff to inspect a host of items mailed into the prison for contraband."). Absent the policy, not only are significant prison resources expended searching received packages to try to find contraband items, if contraband is introduced into the facility it threatens the security of both guards and inmates. "When accommodation of an

asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90.

Under the fourth *Turner* factor, the court should consider whether alternative restrictions are available that would serve the government's interest without impinging upon the protected constitutional right. The availability of obvious alternatives may be evidence that the regulation was an " 'exaggerated response' " to prison concerns. 482 U.S. at 90. But "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." 482 U.S. at 90-91. If the resident can point to an alternative that accommodates his or her constitutional rights with *de minimis* impact on the legitimate interests of the institution, then it may be an indication that the regulation does not satisfy the reasonable relationship standard. 482 U.S. at 91. We cannot envision any less restrictive means to achieve the government's interest, nor does Chubb suggest any. The requirement that items only be allowed into the hospital that are sent from recognized and approved vendors assures staff that there is no possibility of tampering. The list of approved vendors could be expanded, but the KDADS has already indicated a willingness to expand the list based on residents' concerns. By the addition of Wal-Mart and Walgreens the products available for purchase are numerous.

Finally, as it relates to Chubb's unique status as a mental patient, instead of a convicted criminal, Chubb does not allege, nor is there any evidence to suggest, that the policy was adopted to punish Chubb in particular or the residents in general.

In sum, we find that even if a fundamental constitutional right is implicated by the three-vendor policy, the policy advances a legitimate government interest and is not arbitrary.

Accordingly, Chubb has failed to state a claim under K.S.A. 60-1501 sufficient to establish a continuing violation of a constitutional stature, and his claim regarding the three-vendor policy fails.

## SUFFICIENCY OF THE GRIEVANCE PROCEDURE

Chubb argues that the district court erred when it summarily dismissed his claim requesting the district court to order the KD-ADS to provide a more viable means for the redress of a patient's grievances. He restates this claim on appeal as being based on a "systemic due process violation." But a petition under K.S.A. 60-1501 must allege "shocking and intolerable conduct or continuing mistreatment of a constitutional stature." *Johnson*, 289 Kan. at 648. Likewise, the first determination a court must make when reviewing a procedural due process claim, the only constitutional claim Chubb makes, is whether a protected liberty or property interest is involved. See *Winston*, 274 Kan. at 409.

Chubb does not claim a violation of a protected liberty or property interest. He claims only a statutory violation based upon K.S.A. 2013 Supp. 59-29a22(d) ("The department of social and rehabilitation services shall establish procedures to assure protection of patients' rights guaranteed under this section."). Chubb has not shown how any delay in the grievance procedure has resulted in an actual violation of his constitutional rights. See *Merryfield v. Jordan*, No. 09-3259-JAR, 2011 WL 382551, at *4 (D. Kan. 2011) (unpublished opinion) ("Plaintiff has not alleged how any failure in the grievance procedure has resulted in an actual violation of his constitutional rights. Even taken as true, plaintiff's allegations do not state a deprivation of federal law, as there is no federal constitutional right to an institutional grievance procedure."); *Merryfield v. Kansas Dept. of SRS*, No. 104,044, 2010 WL 5490755, at *4 (Kan. App. 2010) (unpublished opinion) (holding no constitutional violation for claim of inadequate grievance procedures brought in the context of K.S.A. 60-1501 petition), *rev. denied* 291 Kan. 913 (2011).

Moreover, Chubb does not claim shocking or intolerable conduct. See *Merryfield v. Turner*, No. 100,059, 2008 WL 4239118, at *5 (Kan. App. 2008) (unpublished opinion) (finding that even if grievance procedure was not strictly followed, the violation does not rise to the level of shocking or intolerable conduct), *rev. denied* 288 Kan. 832 (2009).

In fact, Chubb appears to agree that the delay in hearing his grievances was related to a systemic problem related to the inability to properly track all of Chubb's 46 grievances. Chubb acknowledged that the KDADS implemented a new grievance policy and his grievances were moving through the grievance process in a timely manner. We do not find this to be shocking or intolerable conduct on the part of the KDADS.

Accordingly, because he has failed to allege or establish shocking and intolerable conduct or continuing mistreatment of a constitutional stature, his claim fails.

## THE AFFIDAVITS RELIED ON BY THE KDADS

Chubb contends, for the first time on appeal, that the district court's decision must be remanded because the district court relied on invalid affidavits submitted by the KDADS. Chubb argues that the affidavits were not sworn or affirmed under oath before a person with the authority to administer the oath of affirmation.

The determination of the validity of an affidavit is a question of law over which this court's review is unlimited. *Meigs v. Black*, 25 Kan. App. 2d 241, 243, 960 P.2d 770 (1998).

"An affidavit is a written statement, under oath, sworn to or affirmed by the person making it before some person who has the authority to administer an oath or affirmation. [Citation omitted.] Whether a document is an affidavit depends upon whether the [affiant] swore to the contents of the document. [Citation omitted.] A document that is simply acknowledged before a notary public is not an oath and does not meet the requirements for an affidavit. [Citation omitted.]" 25 Kan. App. 2d at 243.

First, Chubb never raised this objection before the district court. Issues not raised before the district court cannot be raised on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). In addition, this appears to be an evidentiary challenge and K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge "unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." See *State v. Holman*, 295 Kan. 116, 126, 284 P.3d 251 (2012).

Finally, Chubb's argument is not persuasive. Both affidavits, just before the affiants' signatures, contain the following language: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." K.S.A. 53-601 allows a declaration under penalty of perjury to be used with the same force and effect as an affidavit sworn to upon oath. Both also contain the following language at the end of the affidavit: "Subscribed and sworn to before me" with the date, followed by a notary public signature and seal.

It is clear that these documents meet the requirements necessary to be deemed affidavits. Therefore, Chubb's argument fails.

Affirmed.